UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Morris Killingham,

    Plaintiff,

 vs.         REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

     Defendant.   Civ. No. 04-2982 (DWF/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision, which denied his application for Disability Insurance Benefits ("DIB"), and Supplement Security Income ("SSI").  The matter is now before the Court upon the parties' cross-Motions for Summary Judgment.  The Plaintiff has appeared by William L. Orr, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Plaintiff's Motion for Summary Judgment be denied, that the Defendant's Motion be denied, and that the matter be remanded to the Commissioner for further proceedings consistent with this Report.

## II. Procedural History

The Plaintiff filed an application for DIB, and SSI, on May 9, 2001, in which he alleged that he had become disabled on December 13, 2000. [T. 84-87, 72]. His claims were denied upon initial review, and upon reconsideration. [T. 60-62, 67-68].

On February 7, 2002, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on November 5, 2002, a Hearing was conducted, at which the Plaintiff appeared personally, and by legal counsel. [T. 19, 29-55]. Thereafter, on February 7, 2003, the ALJ issued a decision which denied his claim for benefits. [T. 19-28]. The Plaintiff requested an Administrative Review before the Appeals Council which, on April 16, 2004, declined to review the matter further, after the Plaintiff had submitted additional materials. [T. 10-12]. Thus, the ALJ's determination became the final decision of the Commissioner. Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. § 1481. This action was commenced on June 17, 2004.

III.  <u>Administrative Record</u>

A.    <u>Factual Background</u>.  At the time of the ALJ's decision, the Plaintiff was fifty (50) years old,  and possessed a general equivalency diploma (G.E.D.).  [T. 20, 113].  The Plaintiff had prior work experience as a laundry aide, janitor, security guard, test technician, and electrical assembler.  [T. 20, 123-30].  As related by the Plaintiff, he stopped working in April of 2001, because of his medical conditions.  [T. 20-21, 117].  The Plaintiff also worked in June of 2001, but testified that he was fired for falsifying his job application, though he contends he misinterpreted the instructions.  [T. 21, 42-43].   As of June 11, 2001, see T. 115, the Plaintiff alleged that he could not work due to his conditions of high blood pressure, diabetes, glaucoma, and a heart attack.  [T. 106-07].

In September of 2000, the Plaintiff sought treatment for headaches and claimed to have suffered from high blood pressure for years.  [T. 181].  His blood pressure was between 200 and 220 over 90 to 102.  He also admitted non-compliance with his medications which included Minoxidil, diuretics, potassium, Glucophage, and others.  <u>Id.</u>[1]  The Plaintiff did not complain of any chest pains.  <u>Id.</u>

---

[1]Minoxidil is used as a antihypertensive.   <u>Dorland's Illustrated Medical</u>
(continued...)

On October 5, 2000, in a visit with treating physician, Dr. Fredrekia Lewis, the Plaintiff's blood pressure was 190 over 100 when arriving, and the repeat measurement was 220 over 100. [T. 177]. His diagnosis was malignant hypertension, arteriosclerotic heart disease, and diabetes mellitus. Id.

On November 30, 2000, the Plaintiff was admitted to a hospital for hypertension treatment, following a recommendation by his treating physician. [T. 156-58, 176]. In the office, the Plaintiff was found to have multiple blood pressures between 212 and 235 over 114 to 142. [T. 156]. The examining physician noted that the Plaintiff was asymptomatic, and that he reported no symptoms of shortness of breath, chest pain, lightheadedness, dizziness, or palpitations, as associated with past atherosclerotic heart disease. [T. 156]. At the hospital, Dr. Kimberlee Thielen noted that the vascular changes in Plaintiff's eyes were consistent with end-organ damage. [T. 157]. At a follow-up visit with Dr. Lewis on December 7, 2000, Plaintiff's blood pressure was 190 over 96. [T. 175].

_____

[1](...continued)
Dictionary, p. 1119 (29th ed. 2000).

In turn, Glucophage is a trademark name for metformin, which is a antihyperglycemic agent used in the treatment of type 2 diabetes mellitus. Dorland's Illustrated Medical Dictionary, pp. 755, 1097 (29th ed. 2000).

On December 20, 2000, Dr. Lewis noted that the Plaintiff's blood pressure had been difficult to control and that he should not be engaged in any physical activities, including work, at that time. [T. 174]. The Plaintiff's blood pressure was 180 over 98. Id.

On July 16, 2001, State Agency Physician, Dr. Charles T. Grant, reviewed the evidence of record, without meeting with the Plaintiff, and concluded that the Plaintiff remained capable of lifting and carrying 50 pounds occasionally and twenty-five pounds frequently. [T. 162-69]. Dr. Grant also opined that Plaintiff could sit and stand and/or walk about six (6) hours in an eight (8) hour work day. [T. 163].

On August 18, 2001, the Plaintiff reported to the North Memorial Health Care emergency room due to increasing symptoms of depression. [T. 186-212]. He appeared to be sad, withdrawn, apathetic, depressed, hopeless, and tearful. [T. 186, 189]. He stated that he had been increasingly depressed since May of 2001, after breaking up with his girlfriend and fiancee of nine (9) and a half years. [T. 186]. Plaintiff stated that he had been devastated by losing contact with his children, and he felt that he had "no purpose to live." [T. 186]. He had lost interest in things that had used to interest him, lost energy, had difficulty sleeping, and began gambling. [T. 188]. Plaintiff reported that he still used alcohol and marijuana. [T. 197]. Plaintiff was

diagnosed with a single episode of major depression, cannabis and alcohol abuse, and antisocial traits, and he was assigned a global assessment of functioning ("GAF") score of 60.[2] [T. 187]. After treatment with Celexa,[3] and Trazodone,[4] the Plaintiff was released three days after his initial admission. [T. 186-87].

In December of 2001, State Agency Physician, Dr. Mario J. Zarama, reviewed the medical evidence of record and opined that the Plaintiff remained capable of performing work involving lifting and carrying twenty pounds occasionally, and ten pounds frequently, in a residual functional capacity ("RFC")[5] assessment. [T. 218-

---

[2]The Global Assessment of Functioning ("GAF") scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 2000). On the 100 point scale, a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning, and 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. Id.

[3]Celexa is an orally administered selective serotonin reuptake inhibitor (SSRI), and is indicated for the treatment of depression. Physician's Desk Reference, at 1344 (57th Ed. 2003).

[4]Trazodone is "an antidepressant used to treat major depressive episodes with or without prominent anxiety." Dorland's Illustrated Medical Dictionary, at 1868 (29th Ed. 2000).

[5]RFC is defined as the most an individual can still do after considering the
(continued...)

25].  He further opined that the Plaintiff could sit and stand, and/or walk, about six (6) hours in an eight(8) hour work day.  [T. 219].  A State Agency Psychologist also reviewed the medical evidence of record, and concluded that he lacked sufficient evidence to assess the nature and severity of the Plaintiff's mental impairments.  [T. 226-39].

Beginning in February of 2002, the Plaintiff sought crisis intervention for increasing depressive symptoms.   [T. 268-72].  He reported poor appetite, poor sleep, poor energy, and poor concentration.  [T. 271].  Later, Plaintiff reported that Celexa was not helpful, and that he was becoming increasingly depressed.  [T. 268].  On March 19, 2002, he reported that he was doing well, and he denied any side effects from his medications.  [T. 267].

On February 26, 2002, the Plaintiff began receiving mental therapy from psychologist Mark Foster ("Foster").  [T. 299, 302-03].  Foster prepared a Medical Assessment Ability to do Work-Related Activities (Mental) Form, on February 28, 2002,  T. 277-80, which advised that Foster had seen the Plaintiff for a depressive

---

[5](...continued)
effects of physical or mental limitations that affect that individual's ability to perform work-related tasks.  20 C.F.R. §§404.1545 and 416.945.

disorder, and for a post-traumatic stress disorder, every one to three weeks from February to October of 2002. [T. 277]. Foster noted that the Plaintiff "[wa]s functioning at quite a low level across the board because of his depressive syndrome," and "[h]e is not able to function day-to-day, 8 hours/day, 5 days/week in a competitive work setting." [T. 277]. When asked to assess the severity of the Plaintiff's symptoms, Foster simply marked "severe" under every category, without providing additional information. [T. 278-79]. He rated the Plaintiff's restrictions of daily living as "extreme," and he reported that the Plaintiff had "marked" difficulties maintaining social functioning. [T. 279]. Foster advised that the Plaintiff had experienced "frequent" deficiencies of concentration, persistence or pace, and had repeated episodes of deterioration or decompensation in work or work-like settings. [T. 279]. Foster's assessment of the Plaintiff diagnosed post-traumatic stress disorder and major depression. [T. 284-303]. In addition, Foster completed a form entitled "Rating of Impairment Severity," in which he determined that the Plaintiff met Listing 12.04 -- Affective Disorders. [T. 281-82].

In April of 2002, the Plaintiff was examined by Dr. Michael Y. Hu, after complaining of severe leg pain, which was thought to be a claudication related to his

diabetic condition.[6]  [T. 304].  The Plaintiff had been diagnosed with diabetes mellitus in 1993.  [T. 156].  Dr. Hu concluded that the Plaintiff's condition would probably improve with a regimen of exercise, and a cessation of smoking.  [T. 304].

On May 29, 2002, the Plaintiff sought treatment for eye pain, and was diagnosed with Posner-Schlossman syndrome (i.e., an acute increase in eye pressure) in his right eye, and he was prescribed eye drops.  [T. 256-57].  Follow-up visits showed normal interocular pressure.  [T. 257].  The Plaintiff also visited a hospital after complaining of a headache, and seeing "halos" around lights, and stated that those complaints were normal when his glaucoma acts up.  [T. 253-55].  In July and August of 2002, notes from visits to the ophthalmologist reflected that the Plaintiff retained 20/30 visual acuity in both eyes, after treatment with medicated drops.  [T. 240-52].

The Plaintiff visited Dr. Lewis in June 27, 2002, for a follow-up check on his diabetes and hypertension.   [T. 324].   Dr. Lewis noted that the Plaintiff had discontinued smoking, and had been exercising and eating properly.  Id.   The

---

[6]Claudication is a complex of symptoms characterized by pain, tension, and weakness in a limb, when an individual begins walking, and disappears after a period of rest.  The condition is associated with arterial diseases of the limbs.  Dorland's Illustrated Medical Dictionary, p. 361 (29th Ed. 2000).

Plaintiff's blood pressure was measured at 138/76, after having lost 15 pounds in a month.  Id.

On August 1, 2002, the Plaintiff returned for a follow-up visit with Dr. Hu.  [T. 309].  Dr. Hu observed that the Plaintiff had reported that he "can walk as much as he wants and there are no limitations in his walking by his left leg as there was before." Id.  Later that month, the Plaintiff reported to Dr. Hu that he was experiencing pain in his left leg after helping his sister move furniture.  Id.  Dr. Hu believed that the injury was a "mild muscle strain" around his left knee.  Id.  In September of 2002, the Plaintiff reportedly had fluid drawn from his left knee in the emergency room.  [T. 323].  A follow-up visit with Dr. Lewis, on October 17, 2002, revealed no swelling of the left knee, good range of motion, and some mild tenderness.  [T. 321].

Dr. Lewis wrote a letter on November 7, 2002, to the Plaintiff's attorney stating that he had treated the Plaintiff since September 20, 2000.  [T. 329].  In that letter, Dr. Lewis advised that the Plaintiff was diagnosed as having difficult to control malignant hypertension, in spite of a multiple medication regimen, in addition to peripheral arterial disease of the lower extremities, and degenerative arthritis of the knees.  Id.  Dr. Lewis opined that the Plaintiff was disabled by hypertension, degenerative arthritis, and degenerative arthritis of the knees.  Id.

B.    <u>Hearing Testimony</u>.   The Hearing on November 5, 2002, commenced with some opening remarks from the ALJ.  [T. 31-33].  The Plaintiff's attorney related that he would be submitting additional records -- namely, additional medical reports. [T. 31-32].   After the Plaintiff's attorney delivered an opening statement, the ALJ began questioning the Plaintiff.  [T. 32-33].

The Plaintiff testified that he lived alone in a building with an elevator.  [T. 33]. He stated that he had served in the military, from 1969 until 1973, when he was undesirably discharged.  [T. 33].  The Plaintiff related that, as far he was concerned, his discharge resulted from going AWOL "because of my post-traumatic stress disorder."  [T. 34].   The Plaintiff explained that his ship had collided with an ammunition ship in the Mediterranean Sea, and he could not "deal with it even though he  had only two weeks to go to receive his honorable discharge." <u>Id.</u>  The Plaintiff then testified that he was incarcerated, from August of 2001through February of 2002, for making terroristic threats towards his "ex-significant other."  [T. 34].  In addition, the Plaintiff reported that he had also been incarcerated for making terroristic threats, and for violating a Restraining Order, in 1990, but that he did not have any DWI's, or drug related arrests.  <u>Id.</u>

- 11 -

The Plaintiff then testified that he could not work a full-time job because of his physical ailments. [T. 34-36].  The Plaintiff related that he suffered problems with his artery, in his lower leg, when he walked multiple blocks, and that, when he exercised it as recommended by the doctor, his knee swelled up and would pop "out of joint." [T. 34-35].  The Plaintiff then testified that he would suffer "glaucoma episodes" five (5) or six (6) times a year, which resulted in effects similar to headaches, and required multiple visits to eye clinics in order to correct the problem.  [T. 35].  The Plaintiff testified that he suffered "benign vertigo," in which he would feel off balance, and "feel like when I'm walking I'm intoxicated."  Id.

The Plaintiff further testified that stress from working caused his hypertension. Id.  According to the Plaintiff, he had sought treatment from a psychiatrist who put him on Paxil[7] in order to deal with the stress, but that he discontinued the use of that medication when he thought he was better.  Id.  The Plaintiff stated that he was terminated from his job because he believed that his employer was angry at all of the

_____

[7]Paxil is the trademarked name for Paroxetine, which has been found to be clinically effective in the treatment of major depressive disorder, obsessive compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder and post traumatic stress disorder.   Physician's Desk Reference, pp. 1585-1586 (59th ed. 2005).

- 12 -

time that he was missing on his doctors' recommendations, and that it was stressful when his employer was looking for "ways to get rid of me." [T. 36]. He said that his doctor sent him to a kidney specialist in order to explore if that was the cause behind his hypertension, but that only resulted in his admittance to an intensive care unit, where the doctor was afraid that he had "struck out." Id. The Plaintiff related that, in 2001, he had attempted to work despite his doctor's recommendations, but that his blood pressure remained high, especially after troubles with his fiancee, and with child visitation. Id. He stated that it "really took a toll on me and I was at the point where I just wanted to take my own life." Id. The ALJ then questioned the Plaintiff about his family situation, to which Plaintiff replied that he had not seen either of his children in over a year, and that he was currently in Court attempting to receive parental recognition. [T. 37]. He also noted that he was not currently paying child support. Id.

The Plaintiff was then questioned by the ALJ about his diabetes. The Plaintiff testified that he was diagnosed with the disease in 1993, and that it affects him when it "goes out of whack," resulting in accelerated weight loss. Id. He stated that he tested his blood sugar levels more than a couple times a week, but not as often as was recommended. [T. 37-38]. The Plaintiff believed that the generic medication, which

was prescribed for his condition, was not as effective, but that he currently felt "pretty good" because he had put on weight.  [T. 38].  The Plaintiff reported that he was taking all of his medications, but that only Trazodone resulted in any side effects, such as fatigue.  Id.

The ALJ then inquired about the Plaintiff's depression symptoms.  The Plaintiff responded that he cried a lot, could not concentrate, had difficulty in making decisions, and was easily frustrated.  Id.  His frustration arose from "things that don't make sense," such as people "putting their bus fare in," and when he is surrounded by people.  Id.  The Plaintiff then related that he had used marijuana for years, but had been sober for fourteen (14) months.  Id.  The Plaintiff testified that he had last consumed alcohol fifteen (15) months before, but that he "never really seemed to have a problem with alcohol."  [T. 39].  The Plaintiff maintained that his problem was "the marijuana" which, he surmised, was a result of depression.  Id.  He stated that he attended Narcotics Anonymous ("NA"), or Alcoholics Anonymous ("AA"), at least two (2) or three (3) times a week, and that he also facilitated meetings on Mondays for mental illness and chemical dependencies.  Id.

The Plaintiff testified that he had "episodes of glaucoma," which he experienced in his right eye.  Id.  During those episodes, "[t]he pressure goes up I get headaches,"

- 14 -

and "I get a halo around the light like a rainbow and my eye feels like there is something in it." Id.  The Plaintiff related that he has no trouble reading or writing, other than some occasional difficulties with his concentration.  Id.  In addition, the Plaintiff testified that he spent his days watching the news, going out for walks, watching additional television, and attending his meetings, where he will sometimes "get involved with some friends over there." [T. 40].  He additionally would attend a "place for mental illness patients," in which he would "get on the computer," and "do different crafts." Id.  The center was only open to people "approved * * * [by] your psychologist and psychiatrist." Id.  The center would sponsor exercise at the YMCA, but the Plaintiff stated that he did not exercise there because of his knee difficulties.  However, the Plaintiff would fish, bowl, go to the movies, as well as concert events that were sponsored by the center.  Id.

The Plaintiff stated that he could stand for forty-five (45) minutes, before pain would affect his "left cheek" and "lower leg," but he did not know the limits of his lifting ability.  [T. 41].  He testified that he possessed a drivers license, but did not own a motor vehicle.  Id.  When asked about his ability to complete everyday chores, the Plaintiff reported that he would "do [his] own laundry right down the hall from my

room" and shop three (3) or four (4) times a month, while normally limiting what he carried.  Id.  He would also watch television and play chess at the center.  Id.

The ALJ inquired about Plaintiff's earning records, and Plaintiff agreed that his highest year of earnings was about twenty-three thousand dollars ($23,000.00) in 1999. Id.  The Plaintiff reported that he sought full-time work after December of 2000 at an "electronic company * * * doing electronic assembly."   [T. 42].  Further, the Plaintiff testified that he was terminated "because they said I falsified the application about my criminal background."   Id.   He maintained, however, that there was "a misunderstanding," and that he was confused by the language on the application question.  Id.  He worked at another place "through Manpower," and then worked "for another place through United Staffing where I was doing packaging type of stuff."  Id. According to the Plaintiff, "[t]hat's when I really started to fill the void of not being with my kids and I was starting to go to the casino."  Id.  The Plaintiff observed that, after losing at the casino he would consider "jump[ing] off the nearest bridge," and that "at that point where it was starting to repeat itself," he checked himself into a crisis unit. Id.  He stated that he "couldn't concentrate," and that he had lost his job at United Staffing because he had missed a day at the hospital.  [T. 42-43].  The Plaintiff related

that "[t]hey told me that if I got better to come re-apply," and that they would try to find him some work.  Id.

Then, the Plaintiff's attorney questioned him about his glaucoma episodes.  [T. 43].  The Plaintiff responded that he would experience a "severe headache" and eye irritation.  Id.  His relief for those symptoms was to "lay down in the dark and keep still."  Id.  The glaucoma episodes could last three (3) to five (5) hours, or they could last for a couple of days.  Id.

The Plaintiff's attorney also inquired about Plaintiff's history of depression.  Id. The Plaintiff testified that he did not know when it had first surfaced and that his family had a history of depression.  [T. 43-44].  The Plaintiff's attorney then asked about the problems that the Plaintiff had with his "post-traumatic stress disorder."  [T. 44].  The Plaintiff related that he had nightmares, and flashbacks, to when he was in the service. Id.  His ex-wife would wake him up from his nightmares, and would tell him he was swimming and yelling.  Id.  The Plaintiff stated that he has a fear of "going on a boat in the water now."  Id.

He described his "traumatic episode," when he "had been on maneuvers all night and shot guns all night."  Id.  The next morning they were going to take on ammunition, and he laid in his bunk.  As recounted by the Plaintiff,  "the next thing I know, all the

bunks started to fall off the walls and dust and smoke was coming in."  The Plaintiff had to wait until the damage control party had verified that it was safe to leave the compartment.  Id.  He stated that, after he was able to leave his bunk, there was a "lot of confusion" in the passageway, that he went to his life raft station, and that, "after that, I kind of forget of what went on or why we didn't abandon the ship."  Id.  The Plaintiff reported that he has nightmares about the incident as "we were in a lot of fire and three of my friends had died and some of us were still alive." [T. 44-45].  He testified that he could not " remember their names," which "bother[ed] [him] more than anything," but that he did remember where they were from.  [T. 45].  The Plaintiff stated that the three (3) people were not actually killed, but that only happened in his dreams.  According to the Plaintiff, in the actual incident, water came into his compartment, from an actual hole in the ship, that required repair at dry dock.  Id.

When asked about his depression, the Plaintiff testified that he has received consultation for his depression every two weeks since February 2002.  [T. 46].  He reported that he still noticed the depression, and that he tended to cry while talking to his therapist about his leg, his desire to work, and about "what else was going on" and "how frustrating it [was]."  Id.  The Plaintiff also recounted his family's history of medical problems.  [T. 46-47].  He stated that he was the only one to have problems

- 18 -

with glaucoma or diabetes, but that his other brothers suffered from high blood pressure.  The Plaintiff observed that he had been taking his prescribed medication for high blood pressure, and that he had battled high blood pressure for a long time. [T. 47].

The Hearing continued with the Medical Expert ("ME"), Dr. John W. LaBree, who questioned the Plaintiff, and testified that he did not have any data on the situation with Plaintiff's legs.  Id.  When asked about his leg condition, the Plaintiff described cramping, and "soreness like cramps" in his legs, when he "walk[s] about three blocks."  Id.  The Plaintiff stated he made the feeling go away by stopping, and by trying to be still for a while, or by sitting.  He also stated that he does not experience cramping any other times.  [T. 48].

When asked about his knee, the Plaintiff responded that the knee "just hurts" when he attempts "exercise and knee bends."  Id.  The Plaintiff waited three (3) weeks, but it "was getting worse" and the "swelling would go down but it was starting to get worse and more sore."  Id.  The Plaintiff recalled going to the emergency room, at Abbott, and having fluid drained from his knee, but he avoided prescribed medication because "it's hard on the kidneys and all my blood pressure and all that stuff."  Id. The Plaintiff saw an orthopedic specialist, and was advised that his knee condition

would not improve, and would worsen, as it was degenerative arthritis.  [T. 48-49].

When asked by the ME about his blood pressure medication, the Plaintiff stated that

he took it daily, but had skipped it for a while when he was depressed, and was "just

trying to kill myself slowly."  [T. 49].

The ALJ then asked the Vocational Expert ("VE") if she had any questions for

the Plaintiff, and she did not.  Id.  When asked by the ALJ, the Plaintiff's attorney

stipulated to the qualifications of the experts, and waived the preliminaries.  Id.  The

ALJ then proceeded to examine the ME.  Id.  The ME prefaced his remarks by stating

that he lacked any data about the current problems concerning the Plaintiff's leg

cramping, and knee, and could only comment on the findings in the records he had

reviewed.  Id.  The ME testified that Plaintiff had "essential hypertension which has

been difficult to manage,"[8] but he noted that the record showed periods when the

Plaintiff was in non-compliance with his doctors' recommendations.  [T. 50].  The ME

noted that the Plaintiff had a history of type II diabetes, but that his most recent blood

sugar levels, when treated with medications, appeared to be normal.  Id.

---

[8]Essential hypertension is high blood pressure occurring without discoverable organic cause.  Dorland's Illustrated Medical Dictionary, p. 858 (29th Ed. 2000).

The ME also reported that the Plaintiff had a history of coronary artery disease, but that the Record lacked any current testing, and that the Plaintiff had denied chest pain.  Id.  The Plaintiff's glaucoma was recent, and had been addressed by seeing an ophthalmologist.  The ME opined that none of Plaintiff's impairments met or medically equaled an impairment in the Listings.[9]  Id.  The ME advised that, on the basis of the records that he had examined, a restriction to light work would be appropriate for the Plaintiff.  Id.  When asked, the ME stated that he would review the records which would later be submitted by Plaintiff's counsel.  [T. 50-51].

The Hearing continued with the testimony of the Vocational Expert ("VE").  The ALJ posed a hypothetical to the VE, in which he asked her to assume an individual, who was forty-eight (48) years of age, had a GED, and past work experience, as set forth in the VE's report.  [T. 51].  The ALJ related that the individual was impaired with hypertension, possible left leg claudication and left knee joint degeneration, and suffered from diabetes, a history of poly-substance abuse and coronary heart disease, glaucoma, headaches, and depression with post-traumatic stress disorder syndrome.  Id.  The

---

[9]Appendix 1 contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, the claimant is found disabled without considering vocational factors.

- 21 -

individual is "limited to lifting and carrying 20 pounds occasionally, 10 pounds frequently, scaffolding or left foot pedal manipulation, who can do work in a low stress environment where minimal industrial standards for production and pay are applicable, [and] who can do work that requires only occasional contact with others." Id. The hypothetical individual was also taking a number of medications, with the only apparent side effect being some tiredness. Id. The hypothetical individual could only perform work that was routine and repetitive in nature, and could perform "up to a low-level semi-skilled three or four steps." [T. 51-52].

With those assumptions, the ALJ asked the VE if the hypothetical individual could perform any work that the Plaintiff had previously performed. [T. 52]. The VE testified that the hypothetical individual could perform work as a janitor, a linen (laundry) aide, or as an electrical assembler. Id. The VE reported that there were approximately ten thousand (10,000) jobs in the State of Minnesota as a laundry aide, thirty-five thousand (35,000) janitorial positions, and approximately seven thousand (7,000) electrical assembly jobs, which met the parameters of the hypothetical. Id. In addition to the jobs previously performed by the Plaintiff, the VE concluded that there were ten-thousand (10,000) jobs in the regional or national economy, as a hand packager, that would also satisfy the requisites of the hypothetical. Id.

- 22 -

The ALJ then altered the hypothetical in order to assume an individual who was only capable of carrying ten (10) pounds occasionally, and five (5) pounds frequently. The VE testified that the electrical assembly position would still be available, as well as other sedentary work.  Id.  The ALJ stated that the VE would also receive additional copies of the newly submitted medical records.  [T. 53].

The ALJ then asked the Plaintiff if there was anything else he wanted to say.  The Plaintiff stated that the electronic industry had taken "a huge hit," and that he had only seen two want ads for electronic assembly positions, which were advertised in that Sunday's newspaper.  Id.  The Plaintiff testified that he would "truly like to work," but that,  because of "everything that was physically wrong with [him]," there was "no way that they would hire [him] because they kn[e]w the problem with the absenteeism."  Id. He wanted to work, but that, physically, "it's too many problems" with his dizziness, vertigo, and fear to work around machinery.  Id.  The Plaintiff testified that he would like to try a part-time job to "help supplement."  [T. 53-54].  He didn't want to "just sit down," because he "saw what that did to [his] dad and he kind of just wasted away," and the Plaintiff did not want that to happen to him.  [T. 54].  The Plaintiff stated that, while he worked at Adler as a linen aide, he tore a ligament on account of the pushing

the large carts around, and that he did not believe he could physically lift heavy bags or linen anymore.  Id.

The Hearing concluded after the VE was examined by Plaintiff's counsel.  The VE testified, on cross examination, that, in normal situations, an employee who consistently missed more than two (2) days a month would likely be terminated from employment.

C.    The ALJ's Decision.  The ALJ issued her decision on February 7, 2003. [T. 19-28].  As required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§ 404.1520 and 416.920.[10]  As a threshold

---

[10]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

(continued...)

- 24 -

matter, the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity, since his alleged onset date.  [T. 21].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise his ability to engage in basic work activities.   After considering the Plaintiff's medical history, and the testimony adduced at the Hearings, the ALJ found that the Plaintiff was severely impaired by hypertension, atherosclerotic heart disease, diabetes mellitus, a history of left lower extremity claudication, and glaucoma.  [T. 21].  The ALJ also found that the Plaintiff had non-severe impairments of right elbow pain, and intermittent low back pain. Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R.

---

[10](...continued)
Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

§§404.1520(d) and 416.920(d).   The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment.  [T. 22].

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure.  See, 20 C.F.R. §§404.1520a and 416.920(a).  The four broad areas relevant to the ability to work are:  activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation.  Id.  After examining the medical evidence, the ALJ concluded that the Plaintiff was subject to a Section 12.04 Affective Disorder, with post traumatic stress, which was characterized by loss of interest, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, and thoughts of suicide. In addition, the ALJ concluded that Plaintiff possessed a Section 12.09 Substance Addiction Disorder in the form of alcohol abuse, currently in remission.  The ALJ discussed what limitations might result from the Plaintiff's mental impairment.  [T. 22].

With regard to the pertinent factors, the ALJ determined that, because of his mental impairments, the Plaintiff had "moderate" difficulties in the area of concentration, persistence, and pace, and "mild" restrictions in his ADL, and social functioning.  Id.  The ALJ further concluded that the Plaintiff had not experienced any

- 26 -

repeated episodes of decompensation.   Id.   In addition, the ALJ found that the

Plaintiff's mental impairments did not meet, or medically equal, the "C" criteria, as set

forth in Section 12.00, of the Listings.   Id.

The ALJ based this determination on the testimony of the Plaintiff, and on the

medical evidence.   Id.   The ALJ noted that Plaintiff testified that he watched the news,

walked, did his own laundry and shopping, and had sufficient mental functioning to do

crafts and to use a computer.   Id.   The ALJ also noted that Plaintiff did testify that he

continued to have symptoms of depression, such as crying spells and frustration, that

interfered with his concentration.   The ALJ observed the medical record reflected that,

with the use of medication, the Plaintiff's mental condition had improved, and that the

Plaintiff had not had any subsequent psychiatric hospitalizations, even though he has

had his "ups and downs, he was doing well and his mood was relatively stable"

according to the Plaintiff's statements to physicians.  [T. 22-23].

The ALJ made note that the Plaintiff's GAF score was 60 at the time of

Plaintiff's discharge, after being hospitalized for depression, which reflected only

moderate symptoms, or moderate difficulty in social, occupational, or school

functioning.   Id.   The ALJ then noted that the Plaintiff's testimony, and the medical

evidence, did not support Foster's opinion that the Plaintiff functioned at a low level

with extreme restriction of daily activities, marked difficulties maintaining social functioning, frequent deficiencies of concentration, persistence or pace, and repeated episodes of deterioration.  [T. 23].  Notably, the ALJ admitted that "Foster's progress notes are illegible."  [T. 22].  In sum, the ALJ concluded that the Plaintiff's mental impairments were not present to the degree that met Sections 12.04 or 12.09 of the Listings.  Id.

The ALJ then determined the Plaintiff's RFC.  [T. 23-26].  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  After considering the testimony at the Hearing, the opinions of the Plaintiff's treating physician and the impartial ME, the objective medical evidence, and the Plaintiff's subjective complaints, the ALJ determined the Plaintiff's RFC to be as follows:

> [S]ince December 13, 2000, the claimant has retained the residual functional capacity to perform work requiring lifting 20 pounds occasionally and 10 pounds frequently, no left foot pedal manipulation, no work around heights or scaffolds, which is routine and repetitive three to four unskilled to low level semiskilled work, involves only

> occasional contact with others, and is low stress with
> minimal industrial standards for pace and persistence.

[T. 25].

The ALJ found that RFC to be consistent with the testimony of Dr. LaBree, the medical reports of Dr. Hu, and the conclusions of the State Agency Consultants who reviewed the Record.  Id.

The ALJ discounted Dr. Lewis's conclusion, that the Plaintiff was disabled by hypertension, degenerative arthritis, and peripheral arterial disease, and found that the "severity of claimant's hypertension appears to be related to lifestyle choice made by the claimant."  Id.  The ALJ noted that Dr. Lewis felt that the condition had "improved since the patient has stopped smoking and is exercising and has a significant weight loss," and that Dr. Hu's evaluations persuasively documented that smoking cessation "completely resolved" the Plaintiff's peripheral arterial disease.  [T. 25, 304, 324].  The ALJ also noted the lack of documentary evidence concerning the Plaintiff's degenerative arthritis of the knees. [T. 25].  The ALJ noted that the medical records, which related to Dr. Hu's treatment of the claudication, were not provided prior to the Hearing and relied upon by the ME, but that, because the cessation of smoking had completely resolved the problem, the ME was not later  provided those records.  The

ALJ accommodated the Plaintiff's claims of left knee pain by formulating an RFC with limitations for working at heights or with left foot pedals. [T. 24]. The ALJ also found that the Plaintiff was not disabled by glaucoma, or headaches, as the medical records corroborated that, with medication, the glaucoma episodes would be controlled and did not have any effect upon Plaintiff's vision. Id.

The ALJ also fully accommodated the Plaintiff's mental impairments in establishing the RFC. The ALJ relied upon the Plaintiff's testimony, that he possessed the mental concentration to watch TV, do crafts, use a computer, go shopping, go for walks by himself, and attend and facilitate NA/AA meetings. [T. 25-26]. The ALJ gave "the claimant the benefit of the doubt," and limited the Plaintiff to jobs involving three (3) or four (4) step routines, which required only occasional contact with others, and "low stress work involving only minimal industrial standards, to accommodate his complaints." [T. 24-25]. The ALJ noted that Foster, who was the Plaintiff's therapist, had contended that Plaintiff was "severely disabled for social security purposes." [T. 26]. The ALJ found Foster's assessment of the Plaintiff's functioning, in lieu of Plaintiff's testimony and the medical evidence, "so widely disparate from the evidence that the undersigned is unable to assign any significant weight to it." [T. 26].

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC, that the Plaintiff could perform his past relevant work as a linen aide, janitor, and electrical assembler, as he had performed those jobs. <u>Id.</u> The ALJ concluded that the Plaintiff was not disabled, and was not under a "disability," as defined in the Social Security Act, and therefore, it was unnecessary to proceed to the final Step. [T. 26-27].

## IV. <u>Discussion</u>

A.    <u>Standard of Review</u>.   The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, <u>Title 42 U.S.C. §405(g)</u>; see also, <u>Moore ex rel. Moore v. Barnhart</u>, 413 F.3d 718, 721 (8th Cir. 2005); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002); <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994), citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>ex Rel Moore</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as

a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."   <u>Banks v. Massanari</u>, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" <u>Vandenboom v. Barnhart</u>, 412 F.3d 924, 927 (8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82

F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the

Commissioner even if this Court, sitting as the finder-of-fact, would have reached a

contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v.

Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of

drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being

subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir.

1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as

there is substantial evidence in the record to support the Commissioner's decision, we

will not reverse it simply because substantial evidence exists in the record that would

have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.

1995), or 'because we would have decided the case differently.'"), quoting Holley v.

Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual

determinations, therefore, is deferential, and we neither reweigh the evidence, nor review

the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir.

2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672,

675 (8th Cir. 1996).

Where, as here, new evidence has been submitted to the Appeals Council, which the Council has examined in declining to review the ALJ's determination, our task is not fundamentally different, although the Record we review is expanded to incorporate the new evidence.  On such occasions, the Appeals Council is to treat the new evidence as though it were a part of the Record before the ALJ, and "then review the case if it finds that the administrative law judge's action, findings, or conclusion [were] contrary to the weight of the evidence," which now includes the new evidence.  Brosnahan v. Barnhart, 336 F.3d 671, 675-76 (8th Cir 2003), citing Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).  Should the Appeals Council decline to review the case further, the reviewing Court's role is to "review the ALJ's decision and determine whether there [was] substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."  Id., quoting Browning v. Sullivan, 958 F.2d 817, 823 n.4 (8th Cir. 1992); see also, Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994)(noting that the standard creates "a peculiar task for a reviewing court," because it asks the Court to decide how the ALJ would have decided the matter had this additional evidence been before him or her).  See, Cunningham v. Apfel, supra at 500.

B.   <u>Legal Analysis</u>.   In support of his Motion for Summary Judgment, the

Plaintiff advances the following arguments:

1.   The ALJ Abused Her Discretion in Disregarding the Opinions of the Plaintiff's Treating Physician and Treating Mental Therapist.

2.   The ALJ Erred in Discrediting the Plaintiff's Testimony in Regard to His Ability to Work Full-time.

We address only the first of the issues, as we conclude that a remand is required

because the ALJ failed to fairly and fully develop the Record as it related to the

Plaintiff's claimed mental impairments.  While, ordinarily, we would address, in the

interests of completeness, the second issue, which focuses upon the ALJ's credibility

determinations, such an exercise is rendered academic, and wholly advisory, in view

of our firm conviction that the ALJ's believability analysis, as well as her resultant RFC,

were necessarily undermined by a less than full and fair development of the Plaintiff's

claimed mental impairments.  As a consequence, we turn to the ALJ's assessment of

the medical evidence.

<u>Did the ALJ Abuse Her Discretion in Disregarding the Opinions of the Plaintiff's Treating Physician, and Treating Mental Therapist</u>?

1.    Standard of Review.   When a case involves medical opinion --
which is defined as "statements from physicians and psychologists or other acceptable
medical sources" -- the opinion of a treating physician must be afforded substantial
weight.  20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d
984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick
v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th
Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating physician is not
necessarily conclusive.  Forehand v. Barnhart, supra at 986 ("A treating physician's
opinion is generally entitled to substantial weight, although it is not conclusive and must
be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v.
Callahan, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating
physician's medical opinion, and adopt the contrary medical opinion of a consulting
physician, when the treating source's statements are conclusory, unsupported by
medically acceptable clinical or diagnostic data, or when the ALJ's determination is
justified by substantial evidence in the Record as a whole.  See, Rogers v. Chater, 118
F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d
633, 639 (8th Cir. 1991); Kirby v. Sullivan, supra at 1328; Ward v. Heckler, 786 F.2d
844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. <u>Id.</u> As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. <u>Id.</u>; <u>Metz v. Shalala</u>, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, <u>20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4)</u>. More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, <u>20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5)</u>. When presented with a treating physician's

opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.   See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii).   Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.   See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e) (1).

2.   Legal Analysis.   The Plaintiff argues that the ALJ failed to accord proper weight to the opinions of Plaintiff's treating physician, Dr. Lewis, and his mental health therapist, Foster, particularly with regard to their opinions as to the Plaintiff's physical and mental ability to perform work-related activities.  [T. 25-26].  In addition, Plaintiff argues that the ALJ was required, under 20 C.F.R. §§404.1512(e) and 416.912(e), to recontact both Dr. Lewis and Foster so as to seek additional evidence, or clarification, before issuing her decision.

As previously noted, the ALJ need not give any weight to a treating physician's conclusory statements regarding total disability.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1); Rogers v. Chater, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the treating physician's opinion.  See, Rogers

v. Chater, supra at 602; Ward v. Heckler, supra at 846. In regards to the Plaintiff's physical ailments, it is important to note that, here, the ALJ did not entirely disregard the opinions of the treating physician. Rather, she determined that Dr. Lewis's opinion of disablement, which was the result of a combination of hypertension, degenerative arthritis, and peripheral arterial disease, was inconsistent with the Record as a whole, including Dr. Lewis's own treatment records for the Plaintiff. [T. 25]. The ALJ noted that Dr. Hu, who was another of the Plaintiff's treating physicians, had stated that the peripheral arterial disease had been resolved through lifestyle choices made by the Plaintiff. Id. Indeed, Dr. Lewis's own records reflect that the Plaintiff's hypertension had shown similar improvement after the Plaintiff stopped smoking, and lost weight. Id.

The ALJ agreed with the ME, and the other reviewing physicians who, having considered Dr. Lewis's notes and other medical records, found the Plaintiff capable of performing at least light exertional activities, notwithstanding his limitations. [T. 25, 50, 162-69, 218-25]. The ALJ also found Dr. Lewis's opinion to be inconsistent with the Plaintiff's own testimony concerning a wide variety of activities that the Plaintiff performed on a daily basis, including grocery shopping, and laundry duties. [T. 25, 39-41]. We find that the ALJ thoroughly considered, and weighed, all of the medical

evidence before him, and properly discounted Dr. Lewis' opinion of November 7,

2002, concerning the Plaintiff's state of disablement, in favor of the assessments of the

ME, the other reviewing and treating physicians, and the Record as a whole.  See,

Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  We find no reversible

error in this respect.

　　　With respect to the mental assessments, which were proffered by Foster, the

Plaintiff argues that "no contrary evidence was offered to dispute the opinion of

claimant's treating psychologist," and that Foster's opinion should be controlling in

regards to a finding of disability based upon mental illness.   See, Plaintiff's

Memorandum in Support of Summary Judgment, at 15.   While we are unable to

concur in the Plaintiff's position, concerning the supposed conclusiveness of Foster's

opinions on the issue of the Plaintiff's mental disability, we find that the ALJ committed

error, which requires a remand, in order that the Record may be fully and fairly

developed with respect to the Plaintiff's mental impairments.

　　　As recently reiterated by our Court of Appeals:

> As our court so recently and forcefully pointed out, it is well
> settled that it is the ALJ's duty to develop the record fully
> and fairly.  Snead v. Barnhart, 360 F.3d 834, 836-37 (8th Cir.
> 2004).  This duty includes the responsibility of ensuring that

> the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue.  Nevland v. Apfel, 204 f.3d 853, 858 (8th Cir. 2000).

Strongson v. Barnhart, 361 F.3d 1066, 1071-72 (8th Cir. 2004).

"It is also well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel."  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000), citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983); see also, Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003), citing Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).

However, the ALJ is not required to function as the Plaintiff's substitute counsel, but need only develop a reasonably complete Record.  See, Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994); see also, Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)("An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision.");  Haley v. Massanari, supra at 749 (concluding that an ALJ is not required to order a consultative medical examination where the Record contained numerous reports from treating and consulting physicians to support the ALJ's decision).  When faced with an objection, that the ALJ has failed to properly develop the Record, the Court's inquiry must focus upon "whether [the

Plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record" and, "absent unfairness or prejudice, we will not remand." Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993); see also, Phelan v. Bowen, 846 F.2d 478, 481 (8th Cir. 1988). In the final analysis, "[t]here is no bright line test for determining when the [Commissioner] has * * * failed to develop the record," for "[t]he determination in each case must be made on a case by case basis." Gregg v. Barnhart, 354 F.3d 710, 712 (8th Cir. 2003), quoting Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994).

Here, we are extremely troubled by the dearth of evidence concerning the Plaintiff's mental impairments. While we agree with the ALJ's assessment, that Foster's expression of opinions, as contained in his "Medical Assessment of Ability to Do Work-Related Activities (Mental)" is both cursory, and conclusory, [T. 277-82], the Record also contains some twenty-one (21) pages of Foster's progress notes, which relate to his clinical treatment of the Plaintiff, and which are largely undecipherable because they are illegible -- mostly because of Foster's script. [T. 283-303]. Although the ALJ noted the illegibility of those notations, she plainly was not concerned about their import, insofar as they pertained to the Plaintiff's mental impairment, as she made no further inquiry of Foster. [T. 22].

Where, as here, critical evidence of Record is illegible, our Court of Appeals has not been hesitant to remand for additional consideration.   As the Court explained, in Bishop v. Sullivan,, 900 F.2d 1259, 1262 (8th Cir. 1990):

> The medical evidence of record submitted prior to the hearing consists of 65 pages, 26 of which are illegible because of poor copy quality or handwriting.  The medical evidence submitted to the Appeals Council after the issuance of the ALJ's decision comprises an additional 99 pages, 39 of which are illegible for the same reasons.  This court has held that illegibility of important evidentiary material can warrant a remand for clarification and supplementation. Miller v. Heckler, 756 F.2d 679, 680-81 (8th Cir. 1985); Brissette v. Heckler, 730 F.2d 548, 550 (8th Cir. 1984); see also Cutler v. Weinberger, 516 F.2d 1282, 1285 (2nd Cir. 1975)(illegible medical reports provide the reviewing court with no way to determine whether the Secretary fully understood the medical evidence before him).

Our considered review of this Record is effectively precluded, insofar as it relates to the Plaintiff's mental impairments, by a less than fully developed Record.  Almost all of the evidence pertaining to the Plaintiff's depression are indecipherable.

Moreover, the void created by the inscrutable nature of Foster's handwriting has not been cured by other evidence.  For understandable reasons, which are plainly related to foundation, the ME expressed no opinion as to the Plaintiff's mental health, nor, quite properly, were questions posed to him on that subject.  Neither is the vacuity

in the Record cured -- if that were possible -- by any clinical assessment submitted by the State Agency Consultants.  In a Psychiatric Techniques Review Form, which was prepared by a State Agency Psychologist, on December 10, 2001, the reviewer could offer no assessment of the Plaintiff's claimed mental impairment because of "insufficient evidence."  [T. 226, and 238].

Under these circumstances, we conclude, as the Plaintiff has urged, that the Commissioner had an obligation, at a minimum, to contact the treating medical source for "'additional evidence or clarification,' 20 C.F.R. §404.1512(e), and for an assessment of how the 'impairments limited [the Plaintiff's] ability to engage in work-related activities.'" Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002), quoting Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001); see also, O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003); Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003). We further conclude that Social Security Ruling 96-5p requires a supplementation, or clarification, of Foster's opinions, by providing as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

61 F.R. 34471, 34474, 1996 WL 362206 (July 2, 1996).[11]

Of course, we are mindful that "[t]he ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim," Sultan v. Barnhart,

_____

[11]The same result follows from 20 C.F.R. §§404.1512(e) and 416.912(e), which provide as follows:

> *Recontacting medical sources*. When the evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions. (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

We understand the Plaintiff to argue that this Regulation requires a contact with the treating medical source, if the ALJ disagrees with the physician's or psychotherapist's report, but that is clearly not the case.  Had the Record before us contained substantial, legible evidence that addressed the Plaintiff's mental impairments, then we might not be caused to remand this action to the Commissioner for further development of the Record.  However, we have not been presented with that option.

368 F.3d 857, 863 (8th Cir. 2004), citing 20 C.F.R. §§416.912(e) and 416.919a(b), but we find that to be precisely the case here. We are forced to conclude that, given the sparsity of evidence concerning the Plaintiff's mental impairment -- if any there be -- and in view of the illegibility of the bulk of the evidence on that precise issue, a remand is warranted in order to avoid an unfair or prejudicial result. See, Snead v. Barnhart, supra at 839, citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995), for the proposition that "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial."

We make plain that we do not suggest, however slightly, that the Plaintiff is disabled by virtue of a mental impairment and, frankly, there is evidence of Record – albeit not medical – that he manages in his daily activities irrespective of his complaints of depression. We conclude, however, that an informed decision on that issue cannot responsibly be reached without additional evidence. Paraphrasing the Court in Bishop:

> On remand, the parties should determine which of the existing medical records are relevant and provide the ALJ with legible copies of these records or direct interrogatories to [Foster or other psychiatrists or psychologists]. If the ALJ requires additional evidence to make a disability determination, he should order consultative examinations to be performed at the expense of the Social Security Administration. See 20 C.F.R. §404.1517(a)(1989).

- 46 -

<u>Bishop v. Sullivan</u>, supra at 1262.

Accordingly, we recommend that the decision of the Commissioner be reversed, and that the case be remanded in order that the Commissioner can develop the record fully and fairly.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 17] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 20] for Summary Judgment be denied.

3.      That this matter be remanded to the Commissioner for further proceedings in accordance with this Report.

4.      That, pursuant to the holding in <u>Shalala v. Schaefer</u>, 509 U.S. 292 (1993),

Judgment be entered accordingly.

Dated:  August 26, 2005                    s/Raymond L. Erickson
                                    Raymond L. Erickson
                                    UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than**

**September 12, 2005**, a writing which specifically identifies those portions of the

Report to which objections are made and the bases of those objections.  Failure to

comply with this procedure shall operate as a forfeiture of the objecting party's right

to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing **by no later than September 12, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.